**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| IN RE: | ) |
| | )     **Case No.  25-bk-80028** |
| **BIOMILQ, INC.,** | ) |
| | )     **Chapter 7** |
| **Debtor.** | ) |
| | ) |

**MOTION FOR ENTRY OF ORDER APPROVING COMPROMISE AND
SETTLEMENT OF CLAIMS PURSUANT TO RULE 9019 AND INCLUDING
TRANSFER OF ASSETS PURUSANT TO 11 U.S.C. §363(f)**

James Lanik, as Chapter 7 Trustee of the Bankruptcy Estate of Biomilq, Inc. ("Trustee"), through counsel, files his Motion for Order Approving Compromise and Settlement of Claims Pursuant to Rule 9019 and Including Transfer of Property Pursuant to 11 U.S.C. §363(f) (the "Motion"). In support thereof, the Trustee states as follows:

**BACKGROUND**

1. This case was initiated by the Debtor filing a petition for relief under Chapter 7 on January 31, 2025 (the "Petition Date"). The Trustee was appointed to serve as the Chapter 7 Trustee shortly thereafter.

2. The Debtor owns numerous Assets[1] including but not limited to intellectual property (patents, trademarks, copyrights, trade secrets). biological materials (cell lines, cell banks, plasmids, reagents, etc.), physical personal property (storage unit contents, lab equipment, laptops, hard drives), digital assets (biomilq.com domain, social media accounts on X, LinkedIn, Medium), and books, records, lab notebooks, and research data.

---

[1] As defined by Paragraph 2 of the Agreement.

3.    Since the Petition Date, the Trustee has undertaken significant efforts to maintain and safeguard the Debtor's Assets from loss. These Assets have required approximately $10,000.00 per month in expenses to preserve for the benefit of creditors.

4.    The Trustee marketed and has attempted to sell these Assets to numerous established life sciences companies as well as startup companies across North America and Europe.  To further those efforts, the Trustee has provided non-disclosure agreements to numerous non-affiliated potential third party buyers so that they could access confidential information with respect to these assets.

5.    Despite numerous buyers expressing significant interest in the assets, the Trustee has only received two offers to purchase the Assets.  The accepted offer is outlined below, and the rejected offer was for $150,000.00, half of the proposed sale price and contained numerous contingencies.

**COMPROMISE AND SETTLEMENT BETWEEN THE PARTIES**

6.    The Trustee and Biomilq Labs, Inc. ("Buyer") have entered into that certain Asset Purchase Agreement and Settlement Agreement, a copy of which is attached hereto as <u>Exhibit A</u> and incorporated herein by reference (the "Agreement").  The core terms of the Agreement are listed for the Court below:

    a.    Payment of $300,000.00 by the Buyer to the Estate of which $100,000.00 was a non-refundable deposit and which has been received by the Trustee;

b.  Mutual releases between the Debtor, Shayne Guiliano ("Guiliano"), and 108Labs; Dismissal of the Litigation Claims;[2] and

c.  Waiver and withdrawal by Guiliano and 108Labs of any claims against the Debtor's estate.

## ARGUMENT

### A. Approval of Settlement Pursuant to Rule 9019

7.  The Trustee seeks the entry of an order approving the terms of the Agreement as outlined above.

8.  Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). Before approving a settlement under Bankruptcy Rule 9019, a court must determine that the proposed settlement is in the best interests of the debtor's estate. *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003, 1010 (4th Cir. 1985) (upholding bankruptcy court's approval of settlement because it was "in the best interests of the estate as a whole").

9.  Additionally, the settlement must be fair and equitable as well as reasonable. *In re Brantley*, No. 13-00483-8-DMW, 2015 WL 230186, at *2 (Bankr. E.D.N.C. Jan. 15, 2015) (citing *Maloy v. Sigmon (In re Maloy)*, 2009 Bankr. LEXIS 4010, at *11 (Bankr. W.D.N.C. Dec. 7, 2009)) (citations omitted). "In determining the reasonableness of a settlement, a bankruptcy judge must decide only whether the settlement falls between the lowest and highest points in the range of

---

[2] These claims (the "**Litigation Claims**") are pending in the following cases: *Shayne Guiliano v. Leila Stickland, Biomilq, Inc.; and Michelle Egger* pending in Orange County District Court with a File No. 22-CvD-000283-670; *Biomilq, Inc. v Shayne Guiliano and 108LABS, LLC* pending in Orange County Superior Court with a File No. 22-CvS-000255; and *Shayne Guiliano v Leila Stickland et al.* pending in the United States District Court for the Middle District of North Carolina with a Case No. 1:24-cv-00563-WO-JEP.

3

reasonableness." *Id.* (quoting *Barrett v. Andre Chreky, Inc. (In re Andre Chreky, Inc.)*, 448 B.R. 596, 609 (D.D.C.2011)) (internal quotation marks omitted).

10.     The Trustee believes that the terms of the Agreement are fair and equitable, in the best interest of the Debtor's estate, and that the settlement avoids significant litigation.

11.     This settlement enables the Trustee to realize the value of the assets sold without undergoing significant litigation in multiple forums.  Pre-petition, the Debtor owed its prior litigation counsel over $387,000.00 in unpaid fees and upon information and belief had spent in excess of $600,000.00 fighting the Litigation Claims.  Despite the massive scale of those costs, the underlying litigation is still in the early stages.  The Trustee estimates that the estate would need to spend about the same amounts, if not significantly more, to litigate those claims to conclusion at the trial court and appellate levels.

12.     The Litigation Claims relate to disputes as to the inventorship and ownership of the intellectual property at issue.  If Giuliano and 108Labs were to prevail, the intellectual property would be determined not to belong to the Debtor.  The Litigation Claims have thus substantially chilled potential buyers from purchasing these assets. Without litigating the Litigation Claims to final judgment, and fully and finally determining the ownership of the intellectual property, the Trustee could not obtain the necessary findings in a sale order that Assets are property of the estate. Section 363(f) does not allow for the sale of assets when the ownership of such assets is in dispute. As one court has recently written:

> Subsection (f)(4) permits the sale of property free and clear of an interest in bona fide dispute only to the extent that the property may be sold under subsections (b) or (c). 11 U.S.C. § 363(f) ("The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if ....") (emphasis supplied). And subsections (b) and (c), in turn, authorize the sale of property by the trustee or debtor in possession only if the property is "property of the estate." 11 U.S.C. §§ 363(b)(1), (c)(1). Accordingly, "[i]mplicit within the statutory grant of authority to sell property under section 363

... is the requirement that the estate actually have an interest in the property to be sold." [*Gorka v. Joseph (In re Atlantic Gulf Cmtys. Corp.)*, 326 B.R. 294, 298-99]. Simply put, "[a] bankruptcy court may not allow the sale of property as 'property of the estate' without first determining whether the debtor in fact owned the property." *Warnick v. Yassian (In re Rodeo Canon Dev. Corp.)*, 362 F.3d 603, 608 (9th Cir. 2004).

*In re Worcester Country Club Acres, LLC*, 655 B.R. 41, 46 (Bankr. D. Mass. 2023). Without finally determining the ownership of the Assets, the Trustee could give only a quitclaim sale of the Assets, transferring whatever interests the estate has, if any.  Such a sale would result in a significantly lower sale price, if the Trustee could sell the Assets at all.

13.     Further, there is no guarantee of success on the Litigation Claims.  While the Trustee believes the Estate would ultimately prevail, the Litigation Claims involve highly disputed factual issues and complex legal issues.  Such litigation is neither inexpensive nor predictable.

14.     Finally, the proposed settlement relieves the estate of significant continued costs to maintain to Assets.  These Assets require monthly payments for cryogenic storage, numerous fees for patent renewals and counsel, and cloud storage for the associated data.

15.     Accordingly, the Trustee requests that the Court entry an Order approving the Agreement.

**B. Sale of Assets Pursuant to 11 U.S.C. §363(b) & (f)**

16.     The Trustee requests this Court approve the proposed sale outside of the ordinary course of business, pursuant to 11 U.S.C. §363(b), which states: "[t]he Trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate".

17.     Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have required that such use, sale or lease be based upon the sound business judgment of the

5

debtor/trustee. *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143, 147–48 (3d Cir. 1986).

18.     With respect to satisfying the elements of the "sound business purpose" test, for the reasons set forth herein, the Trustee asserts that the sale of Assets is the most efficient sale that will maximize recovery for the Estate.

19.     To the extent that any party claims a third-party interest in the Assets, the trustee may sell property free and clear of a third-party interest if "such interest is in bona fide dispute[.]" 11 U.S.C. § 363(f)(4).  A trustee who can show that "there is an objective basis for either a factual or legal dispute as to the validity of the asserted interest" will be allowed to sell the property free of the third-party's lien. *In re Marko*, 2014 WL 948492 at *4 (Bankr. W.D.N.C. 2014) (quoting *In re Daufuskie Island Props., LLC*, 431 B.R. 626 (Bankr. D.S.C. 2010)).

20.     As to the sound business purpose test, the Proposed Sale represents the highest and best offer that the Trustee has received for these Assets despite extensive marketing done by the Trustee.  Further, this Proposed Sale is the only sale that allows the Trustee to avoid the significant costs from continued litigation.

21.     To the extent that the Litigation Claims reflect any claimed lien or trust from Guiliano or any other party in interest in the Assets, those interests can be sold free and clear as there is a bona fide dispute as to the validity of those asserted interests.

**WHEREFORE**, for the reasons expressed herein, the Trustee respectively requests the Court enter an Order:

A.       Approving the Trustee's proposed compromise and settlement between the Trustee and Buyer attached hereto as the Agreement;

B.       Approving the Trustee's proposed sale of the Assets to the Buyer free and clear of liens;

C.       Authorizing the Trustee to take all actions necessary to implement the Agreement; and

D.       Granting such other and further relief as the Court deems necessary and proper.

Respectively submitted, this the 23rd day of March 2026.

**WALDREP WALL BABCOCK & BAILEY PLLC**

*/s/ James C. Lanik*
James C. Lanik (N.C. Bar No. 30454)
Zachary Malnik (N.C. Bar No. 61807)
Waldrep Wall Babcock & Bailey PLLC
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-722-6300
Email: notice@waldrepwall.com

*Counsel for Trustee*

7

# **<u>EXHIBIT A</u>**

**ASSET PURCHASE AGREEMENT AND SETTLEMENT AGREEMENT**

**BETWEEN**

**JAMES LANIK, AS CHAPTER 7 TRUSTEE FOR
BIOMILQ, INC.**

**as Seller**

**AND**

**BIOMILQ LABS, INC.**

**as Buyer**

Dated as of: December **16** , 2025

## ASSET PURCHASE AGREEMENT AND SETTLEMENT AGREEMENT

THIS ASSET PURCHASE AGREEMENT AND SETTLEMENT AGREEMENT (this "**Agreement**"), dated as of the **16th** day of December 2025, between JAMES LANIK, not individually but as the Chapter 7 Trustee of Biomilq, Inc. (the "**Trustee**" or the "**Seller**"), and BIOMILQ LABS, INC. (the "**Buyer**") along with Shayne Guiliano ("**Guiliano**"), recites and provides:

### RECITALS

WHEREAS, a voluntary petition for relief under Chapter 7, Title 11 of the United States Code (the "**Bankruptcy Code**") was filed by Biomilq, Inc. ("**Debtor**") in the United States Bankruptcy Court for the Middle District of North Carolina (the "**Bankruptcy Court**") on January 31, 2025.  Seller was then appointed as the Chapter 7 trustee for the Debtor and is duly serving in that role.  The Debtor's case is pending in the Bankruptcy Court as Case No. 25-80028 (the "**Bankruptcy Case**").  The bankruptcy estate of the Debtor is referred to herein as the "**Estate**".

WHEREAS, both prior to, and during, the Bankruptcy Case, the Debtor has asserted claims against Guiliano and Guiliano has asserted claims against the Debtor. These claims (the "**Litigation Claims**") are pending in the following cases: *Shayne Guiliano v. Leila Stickland, Biomilq, Inc.; and Michelle Egger* pending in Orange County District Court with a File No. 22-CvD-000283-670; *Biomilq, Inc. v Shayne Guiliano and 108LABS, LLC* pending in Orange County Superior Court with a File No. 22-CvS-000255; and *Shayne Guiliano v Leila Stickland et al.* pending in the United States District Court for the Middle District of North Carolina with a Case No. 1:24-cv-00563-WO-JEP.

WHEREAS, Seller believes that it is in the best interests of the Estate to sell the Assets (defined below) and settle the pending Litigation Claims with Guiliano, and Buyer wishes to purchase the Assets from Seller and Guiliano wishes to settle the Litigation Claims, all subject to the approval of the Bankruptcy Court and as more particularly provided below.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows.

1.     <u>Court Approval</u>.  The parties' respective obligations to purchase and sell the Assets pursuant to this Agreement are subject to Bankruptcy Court approval after notice and a hearing, and the provisions, requirements and limitations of the Sale Order (defined below).

2.     <u>Sale and Purchase of Property</u>.  Subject to the terms and conditions of this Agreement and the Sale Order, and subject in all events to the approval of the Bankruptcy Court, on the Closing Date (defined below), Seller shall sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred, conveyed and delivered to Buyer, and Buyer shall

1

purchase and acquire from Seller, Seller's right, title and interest in and to the following (collectively, the "**Assets**"):

2.1 **"IP Assets"** means, to the fullest extent constituting property of the Debtor's estate under 11 U.S.C. § 541, all intellectual property and intangible rights created, owned, held, or controlled by the Debtor, including, without limitation:

A. **Patents and Technology.** All existing or future patents, patent applications, invention disclosures, processes, ideas, scientific results, methods, designs, improvements, industrial designs, and other intellectual property, technology and proprietary rights developed by the debtor and debtor employees, officers or directors prior to the Petition Date, including all related biological inventions and patentable subject matter arising from scientific conception, experiments, cell lines, cell-based production methods, or compositions of matter, wherever located and however stored, whether in the cloud or on physical laptops, personal computers, or mobile devices.

B. **Trademarks and Related Rights.** All trademarks, service marks, trade names, logos, slogans, trade dress, domain names, uniform resource locators (URLs), social media accounts and handles, together with the goodwill associated therewith.

C. **Copyrights and Works.** All copyrights, works of authorship, mask works, software, source code, object code, databases, compilations, audiovisual works, and all registrations and applications related thereto including any source code repositories (GitHub, GitLab), electronic notebooks, cloud-stored files, or credentials necessary for access.

D. **Trade Secrets and Confidential Information.** All trade secrets, know-how, formulas, algorithms, technical data, proprietary methods, business processes, promotional materials, websites, customer and supplier lists, pricing and marketing data, business plans, research and development, and other confidential or proprietary information  produced by the employees, directors, or contractors of debtor including, without limitation, laboratory notebooks (physical and electronic), experimental data, email records, electronic records, research notes, test results, images, databases, and digital backups containing or embodying such proprietary information, wherever located and however stored, whether in the cloud or on physical laptops, personal computers, or mobile devices, including all embodiments of such information, and all rights to maintain the confidentiality and enforce the secrecy of such information under applicable trade-secret laws. The Trustee acknowledges that Buyer's receipt of such materials does not constitute publication or waiver of confidentiality.

E. **Contractual and Personal Rights.** All rights of publicity, privacy, and similar rights relating to individuals to the extent transferable, and all rights arising under licenses, sublicenses, consents, confidentiality agreements, employment agreements, intellectual property ownership agreements, assignments, and similar arrangements between the debtor and any other person relating to the foregoing.

F. **Enforcement and Proceeds.** All rights to enforce, sue, or recover for past, present, or future infringement, misappropriation, misuse, dilution, or other violation of any of the foregoing, and all proceeds, income, royalties, damages, claims, and causes of action relating thereto.

2

G. **Registrations and Extensions.** All existing or future registrations, applications, continuations, divisions, renewals, extensions, reissues, reexaminations, and foreign counterparts of any of the foregoing.

H. **Material Transfer Agreements.** All ownership established by material transfer agreements between debtor and third parties, by which debtor acquired ownership and right to commercial use of Biological Materials.

I. **Cell Donor Consent Agreements**. All ownership established by consent or related agreements by which any human cell donor granted or conveyed ownership interests and/or right to commercial use of Biological Materials to the debtor.

2.2 "**Biological Materials**." All cell lines, cell banks, vials, plasmids, expression systems, DNA constructs, engineered cells, production strains, reagents, experiment samples, and any derivatives, progeny, or modifications thereof, including any associated data, characterization reports, or storage records, whether in tangible or digital form.

**2.3 "Personal Property"** shall mean (i) all contents of storage units located at units 1061 and 3093 located at Self Storage Plus – Durham, (ii) all property and Biological Materials stored at Kryosphere, (iii) work product including work journals and the hard drive backups of the Debtor's data, (iv) the biomilq.com domain name, (v) all laptop computers, desktop computers, tablet computers, cellular telephones, and any other electronic devices capable of storing and retrieving data owned by the Debtor which have not already been sold by the Trustee, wherever located and by whomever held, including all data contained on such devices; (vi) electronic records owned by the Debtor as of the Petition Date, (vii) the Biomilq medium.com, X.com (formerly known as Twitter.com), LinkedIn.com accounts, and any other public-facing accounts owned by the Debtor or bearing the Debtor's trademarks, and any related administrative control credentials necessary to control and manage these accounts, (viii) all cell lines and scientific samples or reagents stored at Kryosphere, (ix) any related inventive or legal work product created or acquired by the Debtor's directors, officers, employees, contractors, or legal counsel only related to the past or future preparation and filing of intellectual property filings, which may be in possession of the Debtor's prior or current legal counsel, wherever located and however stored, whether in the cloud or on physical laptops, personal computers, or mobile devices.

**2.4 Books and Records**. All books, records, research data and results, files, laboratory notebooks, electronic communications, drawings, schematics, test results, reports, software, and all other documentation or media (in any format) that relate to the conception, reduction to practice, development, manufacture, or testing of any of the Assets, wherever located and however stored, whether in the cloud or on physical laptops, personal computers, or mobile devices.

3.    Conveyance of Property.  Subject to and in accordance with the provisions of this Agreement and the Sale Order, and subject to approval of the Bankruptcy Court, Seller shall execute and deliver to Buyer on the Closing Date the following instruments pursuant to which Seller shall sell, assign, transfer, convey and deliver the Assets to Buyer on an AS-IS, WHERE-IS BASIS, WITHOUT REPRESENTATIONS OR WARRANTIES:

3.1.    A bill of sale transferring the Personal Property, together with any key(s), gate code(s), or access code(s) necessary for Buyer to retrieve the Personal

3

Property from its current location. It shall be the responsibility of the Buyer to remove the Personal Property within thirty (30) days of the Closing Date.

3.2. The biomilq.com domain name will be transferred to control of the Buyer through steps taken at the necessary domain name Registrar which currently manages the domain, by coordination of the technical steps necessary to transfer control of the domain name to the Buyers, such as by sending a DNS transfer requests to the Registrar, or the like. In the event the Trustee cannot gain necessary access to the DNS account to request a transfer of the domain using the standard transfer protocols, the Trustee will sign a letter of authorization allowing the Buyer to petition the registrar and any other relevant authorities to complete a transfer of ownership and control of the Biomilq.com domain to a domain name service provider authorized by the Buyer to manage the biomilq.com domain.

3.3. Control and ownership of the Biomilq medium.com, X.com (formerly known as Twitter.com), Linkedin.com accounts, and any other public-facing accounts owned or controlled by the Debtor will be transferred to the Buyer, using whichever technical methods that may be required, such as changing the associated email accounts and sharing login credentials. The Trustee will sign a letter of authorization allowing the Buyer to transfer control of these accounts, so the Buyer may have control of all valuable public facing accounts which utilize the Biomilq trademark.

3.4.  Control of any electronic records systems by which the Trustee has access, or may gain access, which the Buyer may become aware of after closing of this transaction, and which may have any records related to the Assets created or owned or controlled by the Debtor prior to the Petition Date.

3.5. Hard copies and/or electronic copies of any contracts or assignments related to the creation and transfer of ownership any of the IP Assets to Debtor, including, but not limited to, any tangible or electronic copies of such records in possession of the Debtor, Trustee, or respective legal counsel of the Debtor, past and present, including but not limited to all contracts executed between the Debtor and its employees, officers, directors, and contractors whereby ownership and/or assignment of intellectual property subject matter and work product is established. Where necessary, the Trustee will expressly request former counsel of the Debtor to transfer all records related to intellectual or personal property created or owned by the debtor to the Buyer using an appropriate format and delivery method. The Trustee does not warrant that any of these documents exist, nor can the Trustee compel former counsel of the Debtor to transfer any records if they assert a retaining or other lien valid pursuant to state law.

3.6.  The Trustee will sign any assignments prepared by the Buyer in a mutually agreeable form and will execute all confirmatory IP, patent, trademark,

4

copyright, and trade-secret assignments, and take all further acts reasonably necessary to vest full title to such Assets in Buyer, including signing USPTO and foreign IP office forms or confirmatory assignments upon request.

3.7.    The Trustee shall execute and deliver any additional assignments, consents, or confirmatory instruments reasonably required by Buyer to perfect title in Buyer's name to any of the IP Assets, including but not limited to current or future USPTO or foreign IP office assignment forms, copyright assignments, and confirmatory assignments of trade secrets or know-how.

3.8.    The Trustee shall arrange for the transfer and delivery of all records in possession of any legal counsel currently or previously engaged with Debtor who contributed work product in the protection, preparation or filing of IP assets. The Trustee cannot compel former counsel of the Debtor to transfer all records if they assert a retaining or other lien valid pursuant to state law.

3.9.    The Trustee shall arrange for the transfer and copy or physical delivery of the company minute books, transfer records, and any other company documents in possession of the Trustee.

3.10.   The Trustee shall arrange for transfer of ownership of all materials stored at Kryosphere, and provide written clarification to Kryosphere that only persons duly authorized by the Buyer may access or request transfer of assets held by Kryosphere.

3.11.   For the avoidance of doubt, the Assets include all cell lines, progeny, derivatives, plasmids, gene constructs, biological samples, reagents, and associated data; all tangible research materials and associated records; and all electronic or physical documentation containing proprietary information of the Debtor. The Trustee shall convey any property related to these Assets to the Buyer and execute and deliver confirmatory assignments of all such Assets to Buyer as may be reasonably requested.

3.12.   To the extent any inventor or creator of intellectual property included in the Assets has not executed an assignment of rights to the Debtor, the Trustee shall execute on behalf of only the Debtor, and not on behalf of any other inventor or creator of intellectual property included in the Assets, any such confirmatory assignments, and Buyer shall be entitled to record such assignments with the USPTO or other relevant authorities.

4.      Excluded Assets.  The term "**Excluded Assets**" means the following assets of Seller, all of which are excluded from the purchase and sale transaction provided for in this Agreement:

5

4.1. the Purchase Price and all cash, cash equivalents, bank accounts or similar types of investments, such as certificates of deposit, treasury bills and other marketable securities;

4.2. all tax returns and all tax credits, tax benefits and claims for refunds in respect of any federal, state, local, and/or foreign income, gross receipts, capital stock, profits, withholding, unemployment, disability, real estate, personal property, stamp, excise, occupation, sales, use, transfer, value added, alternative minimum, severance, estimated or other taxes, including any interest or addition thereto, for periods ending on or before the Closing Date;

4.3. any and all right, title and interest in any insurance policy(ies) owned by or insured against the Debtor and any and all amounts claimed and/or collected pursuant to such insurance policy(ies);

4.4. all contract rights, rights of action, claims for damages, rights of setoff, rights of recoupment, claims, demands, actions, causes of action, judgments, arising under or related to insurance policy(ies) owned by or insured against the Debtor;

4.5. the membership interests and any other ownership interests in the Debtor, and the transfer records, and, except as expressly included in Section 2.1, all other company documents of Debtor;

4.6. all rights, claims, causes of action, defenses and other matters that relate or belong to the Debtor and/or the Seller, including without limitation any claims or causes of action which are property of the estate under section 541 of the Bankruptcy Code including those arising under or in connection with Chapter 5 of the Bankruptcy Code. Provided, however, that the foregoing exclusion shall not be construed to include any rights, claims, causes of action, defenses, or other matters conveyed to Buyer pursuant to Section 2.1E. and 2.1F.;

4.7. the Debtor's accounts receivable; and

4.8. any asset not specifically included in the definition of "Assets".

5. <u>Deposit</u>.

5.1. Upon execution of this Agreement by the last of Buyer and Seller, Buyer shall have deposited the sum of ONE HUNDRED THOUSAND AND 00/100 DOLLARS ($100,000.00) of the Purchase Price with the Trustee's counsel, Waldrep Wall Babcock & Bailey PLLC (the "**Deposit Agent**"), in the form of a wire transfer payable to Deposit Agent, in escrow, as Buyer's initial deposit under this Agreement (the "**Deposit**"). The Deposit shall be **NON-REFUNDABLE** and shall not be returned to Buyer under any

circumstances, except upon an uncured default by Seller as set forth in Section 15.2. The Deposit shall be held without interest and shall be applied against the Purchase Price at Closing. If the proposed sale of the Assets contemplated in this Agreement is denied by the Bankruptcy Court for any reason, the Trustee shall be entitled to retain the Deposit as liquidated damages for the delay in selling the Assets, and not as a penalty.

6.      Purchase Price. The purchase price for the Assets shall be $300,000.00 (the **"Purchase Price"**). At the Closing, Buyer shall pay to Seller the Purchase Price by wire transfer of immediately available funds to such account(s) as Seller shall designate.

7.      Bankruptcy Court Approval

7.1     Bankruptcy Court Approval. Seller shall use commercially reasonable efforts to obtain Bankruptcy Court approval of the sale of the Assets to Buyer, provided that Seller shall not file the sale approval motion prior to February 6, 2026t unless this condition is waived by the Buyer, pursuant to this Agreement (the "**Sale Order**"), which shall contain the following provisions:

(a)     a finding that Seller prepared and served a motion seeking the Sale Order, and such motion and notice were proper and sufficient as to all parties entitled to same;

(b)     the sale and transfer of the Assets to the Buyer is approved pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code;

(c)     the sale of the Assets to Buyer pursuant to this Agreement will be free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code, with such Liens, if any, attaching to the sale proceeds;

(d)     Buyer is not a mere continuation of Seller or Debtor, there is no continuity of enterprise between Seller or the Debtor and Buyer, Buyer is not a successor to Seller or the Debtor and the transactions contemplated by this Agreement do not amount to, or otherwise constitute a consolidation, merger or *de facto* merger of Buyer and Seller or the Debtor and the Sale Order shall expressly provide that Buyer shall not assume or be liable for any liabilities of Debtor, whether known or unknown, asserted or unasserted, fixed or contingent, except as expressly set forth herein.;

(e)     Buyer has acted in good faith within the context of and is entitled to the protections of Section 363(m) of the Bankruptcy Code;

7

(f)      the transactions contemplated hereunder are not avoidable pursuant to Section 363(n) of the Bankruptcy Code;

(g)      Buyer is not assuming or acquiring any of the Excluded Assets; and

(h)      all Persons are enjoined from in any way pursuing Buyer or the Assets by suit or otherwise to recover on any Liens which they may have against Debtor or the Assets as of the Closing Date.

8.      <u>Conditions to Obligations of Buyer</u>.  The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or before Closing of each and every one of the following conditions, which may be waived in whole or in part by Buyer:

8.1      the Sale Order shall have been entered by the Bankruptcy Court, and the Sale Order shall contain findings set forth in Section 7 above; and

8.2      the representations and warranties of Seller shall be true in all material respects on and as of the Closing Date, with the same effect as though made on and as of such date, and Seller shall not be in default in any material respect under the provisions of this Agreement.

8.3      If any of the foregoing conditions is not satisfied by Seller or waived by Buyer before or at the Closing, Buyer may terminate this Agreement and Seller shall forthwith return the Deposit to the Buyer, and neither Party shall have any further obligations to the other, other than under Section 16 and any other provision of this Agreement that expressly provides for such survival.

9.      <u>Conditions to Obligations of Seller</u>.  The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or before the Closing of the following conditions, which may be waived in whole or in part, by Seller:

9.1      the Sale Order shall have been entered by the Bankruptcy Court;

9.2      the representations and warranties of Buyer shall be true in all material respects on and as of the Closing Date, with the same effect as though made on and as of such date, and Buyer shall not be in default in any material respect under the provisions of this Agreement; and

9.3      Buyer shall have paid to Seller the Purchase Price and paid or escrowed the other amounts required by this Agreement to be paid or escrowed at Closing.

10.      <u>Closing</u>.

8

10.1    Unless otherwise agreed to by the Seller and Buyer in writing, the closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place on or before ten (10) calendar days after the Sale Order is final and not subject to appeal (the "**Closing Date**").  The Seller and Buyer may agree in writing to proceed to Closing at an earlier date provided that the Sale Order contains a waiver of the 14-day stay period in accordance with Fed. R. Bank. P. 6004(h).  Notwithstanding anything herein to the contrary, if the Sale Order has been stayed by an order of a court of competent jurisdiction, then the Closing Date shall be postponed until not more than five (5) business days after the stay has been finally dissolved.  If such postponement is longer than 120 days, Buyer and Seller shall each have the right to terminate this Agreement by giving written termination notice to the other, in which case neither Party shall have any further obligations under this Agreement except those that expressly survive the termination of this Agreement.

10.2    At the Closing, Seller shall deliver to Buyer:

(a)    the transfer instruments provided for in Section 3;

(b)    all login credentials, passwords, two-factor authentication devices, and recovery keys for cloud services, email accounts, and software platforms used by the Debtor in the creation or maintenance of any Assets in the possession of the Trustee; and

(b)    such other documents as Buyer may reasonably request to consummate the transaction provided for in this Agreement.

10.3    At the Closing, Buyer shall deliver to Seller:

(a)    the Purchase Price as provided in Section 6;
(b)    the transfer instruments provided for in Section 3; and
(c)    such other documents as Seller may reasonably request to consummate the transaction provided for in this Agreement.

10.4    Buyer shall pay, on the Closing Date, the cost of recording any assignments or transfer documents. Each Party shall pay its own attorneys 'and other professionals' fees.

11.    <u>Mutual Releases.</u>

11.1    Upon receipt of the Purchase Price and upon the Closing, the Trustee, for himself, the Debtor, and the Debtor's bankruptcy estate and their respective officers, directors, employees, agents, attorneys and members (past and present), claims holders, forever remise, release, acquit, satisfy, and forever discharge the Buyer and Guiliano, including their respective successors, assigns, estates, beneficiaries, officers, managers, directors, employees,

9

contractors, corporate partners, agents, attorneys, economic interest owners, and members shall be deemed to have remised, released, acquitted, satisfied, and forever discharged all manner of actions, causes of action, suits, debts, covenants, contracts, controversies, agreements, promises, claims and demands whatsoever, which the Trustee, the Debtor, and the Debtor's bankruptcy estates ever had or now has against the Buyer and Guiliano including their respective successors, assigns, estates, beneficiaries, officers, directors, employees, agents, attorneys and members, or which any of their successor, beneficiary, or assign of the Trustee, the Debtor's, and the Debtor's bankruptcy estate hereafter can, shall, or may have, by reason of any matter, cause, or thing whatsoever, whether known or unknown, from the beginning of time to the date of this Agreement, including, without limitation, all claims, demands and defenses that were or could have been raised in the bankruptcy cases of the Debtor, any associated adversary proceeding, or the pending Litigation Claims. This paragraph, however, shall not operate or be construed to operate as a release or discharge of any of the obligations under this Agreement.

11.2    Upon payment of the Purchase Price and upon the Closing, the Buyer and Guiliano, for each of them, fully release the Trustee, the Debtor, and the Debtor's bankruptcy estate including its attorneys and accountants of and from all manner of actions, causes of action, suits, debts, covenants, contracts, controversies, agreements, promises, claims and demands whatsoever, which the Buyer and Guiliano ever had or now has against the Trustee, the Debtor and the Debtor's bankruptcy estate, or which any of their successor beneficiaries or assigns hereafter can, shall or may have, by reason of any matter, cause or thing whatsoever, whether known or unknown, from the beginning of time to the date of this Settlement Agreement, including, without limitation, all claims, demands and defenses that were or could have been raised against the Trustee or the Debtor in the bankruptcy cases of the Debtor, any associated adversary proceeding or the pending Litigation Claims. This paragraph, however, shall not operate as a release or discharge of any of the obligations under this Settlement Agreement, nor shall it operate as a release or discharge of any claims that the Buyer or Guiliano may have had or now have against any individual officers, directors, shareholders, agents, or attorneys of the Debtor, including but not limited to claims previously asserted against such individuals in the Litigation Claims. Upon Closing, proofs of claim #10 and #11 filed in the Bankruptcy Case shall be disallowed without further order of the Court.

12.    Dismissal of Litigation Claims. Upon receipt of the Purchase Price and after the Closing Date, all parties to this Agreement shall take necessary actions to dismiss without prejudice each of the pending Litigation Claims between all parties to this Agreement. Notwithstanding the foregoing sentence and the provisions of Section 11, nothing in this Agreement shall in any way affect any claims asserted by or between Leila Strickland and Shayne

10

Guiliano with respect to the claims related to the equitable distribution of martial assets, and nothing in this Agreement shall in any way affect any claims asserted by Guiliano against Leila Strickland with respect to any past or future claims arising from her rights, responsibilities and conduct related to her prior or current relationship with Guiliano.

13. _Representations and Warranties of Seller_. Trustee represents and warrants to Buyer that Trustee is the duly appointed Chapter 7 Trustee for the Debtor, and that, subject to the entry of the Sale Order without any stay being obtained by any party in interest within the requisite period, Trustee has the power to convey the Assets to Buyer pursuant to this Agreement and subject to and in accordance with the provisions of the Sale Order.

14. _Representations and Warranties of Buyer_. Buyer hereby represents and warrants to Seller, which representations and warranties shall survive Closing, as follows:

14.1 At the time of closing, Buyer will be a corporation duly organized and validly existing under the laws of the State of Delaware.

14.2 The execution, delivery and performance by Buyer of this Agreement and the other documents and instruments contemplated hereby are within the power of Buyer and have been duly authorized by all necessary action by Buyer. This Agreement is, and the other documents and instruments contemplated hereby will be, when executed and delivered by Buyer, the valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms.

14.3 Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will result in a violation by Buyer of any federal, state, local or other law or governmental requirement of any kind, nor any rules, regulations, permits, licenses and orders promulgated thereunder.

14.4 **BUYER, ON BEHALF OF ITSELF AND ANY AFFILIATES OR RELATED PARTIES, UNDERSTANDS AND AGREES THAT THE ASSETS ARE SOLD, ASSIGNED, TRANSFERRED AND CONVEYED TO BUYER IN "AS IS" CONDITION ON A "WHERE IS" BASIS, WITH NO CONTINGENCIES OF ANY KIND INCLUDING FINANCING OR DUE DILIGENCE AND WITHOUT ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED, EXCEPT AS OTHERWISE EXPRESSLY STATED IN THIS AGREEMENT**.

15. _Default and Remedies_.

15.1 If the Closing fails to occur because of a default, misrepresentation or breach of warranty by Buyer, Seller shall be entitled to retain the Deposit as

11

Seller's sole remedy at law or in equity for Buyer's failure to close on the purchase of the Property.  In any such event, Buyer shall continue to be liable under any provisions of this Agreement that expressly survive the termination of this Agreement.

15.2 If the Closing fails to occur solely because of a default by Seller under the provisions of this Agreement, the Sale Order or any other order of the Bankruptcy Court applicable to the sale of the Property hereunder, then Buyer may, as its exclusive remedy, receive a return of its Deposit and terminate this Agreement by notice to Seller.

15.3 If the Closing fails to occur solely because of the Bankruptcy Court's refusal to enter the Sale Order (or if the Sale Order is entered and is later overturned on appeal), and not due to a breach by either Party to this Agreement, the Trustee shall be entitled to retain the Deposit as liquidated damages for the delay in attempting to sell the Assets, and not as a penalty.

16. Further Assurances.

16.1 Each Party shall cooperate with the other and execute and deliver to the other Party such other instruments and documents and take such other actions as may be reasonably requested from time to time by the other Party as necessary to carry out, evidence, and confirm the intended purposes of this Agreement including confirmatory patent, copyright, or trade-secret assignments, and authorizing recordation thereof with the USPTO or other relevant agencies.

17. Miscellaneous.

17.1 This Agreement and the Schedules to this Agreement may not be amended except by an instrument in writing signed on behalf of each Party.

17.2 This Agreement, together with the Schedules and other agreements referred to in this Agreement, constitute the entire agreement between the Parties pertaining to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the Parties regarding such subject matter.

17.3 All notices and other communications under this Agreement shall be in writing and shall deemed given if delivered personally or mailed by registered or certified mail, postage prepaid, return receipt requested (such mailed notice to be effective on the date such receipt is acknowledged) or delivered by a recognized overnight delivery system (such overnight notice to be effective on the date of receipt) as follows:

12

| If to Buyer, addressed to: | Biomilq Labs, Inc. |
| | Attn: Legalinc Corporate Services Inc., Registered Agent |
| | 131 Continental Drive, Suite 305 |
| | Newark, DE 19713 |

| With a copy to: | Landon G. Van Winkle |
| | Smith Debnam Narron Drake Saintsing & Myers, LLP |
| | P.O. Box 176010 |
| | Raleigh, NC 27619-6010 |
| | lvanwinkle@smithdebnamlaw.com |

| If to Seller, addressed to: | James C. Lanik, Trustee |
| | Waldrep Wall Babcock & Bailey PLLC |
| | 370 Knollwood Street, Suite 600 |
| | Winston-Salem, NC 27103 |
| | jlanik@waldrepwall.com |

| With a copy to: | Zachary Malnik |
| | Waldrep Wall Babcock & Bailey PLLC |
| | 3600 Glenwood Avenue, Suite 210 |
| | Raleigh, NC 27612 |
| | zmalnik@waldrepwall.com |

or to such other place and with such other copies as either Party may designate as to itself by written notice to the others.

17.4   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

17.5   This Agreement shall not be recorded by Buyer and, if recorded by Buyer, Seller may immediately terminate all of its obligations under this Agreement, and Buyer shall pay Seller's Legal Costs in removing this Agreement of record. The provisions of this Section 17.5 shall survive the Closing.

17.6   If the last day of any time period provided for in this Agreement falls on a Saturday, Sunday or holiday, the last day shall be extended until the next business day that banks operating in Raleigh, North Carolina are open for business, but in no case will the extension be for more than three days.  For

13

purposes of this Agreement, "business day" shall mean any day other than a Saturday, a Sunday, or any other day on which banking institutions in Raleigh, North Carolina are closed or are authorized to be closed, including all legal holidays.

17.7    The rights and obligations of Buyer hereunder may be assigned to one or more affiliated entities without the consent of Seller, and to any unaffiliated third party with the prior written consent of Seller. No assignment under this provision shall relieve Buyer of liability to Seller for amounts accruing under this Agreement. This Agreement shall be binding upon, and shall inure to the benefit of, the successors and permitted assigns of the parties hereto. The Parties neither intend to confer any benefit hereunder on any Person other than the parties hereto, nor shall any such third party have any rights hereunder.

17.8    Except to the extent governed by the Bankruptcy Code, this Agreement shall be governed by, construed, interpreted and the rights of the Parties determined in accordance with the laws of the State of North Carolina without reference to its choice or conflicts of laws principles. Each Party: (i) irrevocably submits to the jurisdiction of the Bankruptcy Court; (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party; and (iv) agrees that service of process upon such Party in any such action or proceeding shall be effective if given in accordance with the notice provisions of this Agreement.

17.9    BUYER AND SELLER HEREBY EACH WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS AGREEMENT.

WITNESS the following signatures as of the date in the preamble.

14

Shayne Guiliano in his personal capacity

Date: _12-12-2025_

BUYER:

Biomilq Labs, Inc.

By (Print Name): Scott Matthews

Its (Title): Director

Signature: _Scott Matthews_

Date: December _12_, 2025

SELLER:

James Lanik as Chapter 7 Trustee of Biomilq, Inc.

Date: December _16_, 2025

15

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| IN RE: ) | |
| ) | **Case No.  25-bk-80028** |
| **BIOMILQ, INC.,** ) | |
| ) | **Chapter 7** |
| **Debtor.** ) | |
| ) | |

**AFFIDAVIT OF SERVICE**

I, James C. Lanik, certify that on March 23, 2026, I did cause a copy of the foregoing **MOTION FOR ENTRY OF ORDER TO APPROVE COMPROMISE AND SETTLEMENT OF CLAIMS PURSUANT TO RULE 9019 AND INCLUDING TRANSFER OF ASSETS PURUSANT TO 11 U.S.C. §363(f)** to be served through electronic service through CM/ECF upon those entities that have properly registered for such service or by depositing same in a postage prepaid, properly addressed envelope into the United States mail.

**Via CM/ECF**
John Paul Hughes Cournoyer, Bankruptcy Administrator
James McKinley Hash on behalf of 108Labs, LLC
William Howard Kross on behalf of 108 Labs, LLC
Rebecca F. Redwine on behalf of Debtor BIOMILQ, Inc.
James C. Lanik, Chapter 7 Trustee
Lydia C. Stoney on behalf of Debtor BIOMILQ, Inc.
Landon Glenn Van Winkle on behalf of Creditor Shayne Guiliano

**Via First Class Mail**
Biomilq Labs, Inc.
Attn: Legalinc Corporate Services, Inc. Registered Agent
131 Continental Drive, Suite 305
Newark, DE 19713

Landon G. Van Winkle
Smith Debnam Narron Drake Saintsing & Myers, LLP
P.O. Box 176010
Raleigh, NC 27619-6010
*Counsel for Shayne Guiliano*

Under penalty of perjury, I declare the foregoing is true and correct.

This the 23rd day of March 2026.

**WALDREP WALL BABCOCK & BAILEY PLLC**

*/s/ James C. Lanik*
James C. Lanik (N.C. Bar No. 30454)
Waldrep Wall Babcock & Bailey PLLC
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-722-6300
Email: notice@waldrepwall.com

*Counsel for Trustee*